UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA

MAURICE JACKSON                                   Case No: 1:16-cv-00579
           PLAINTIFF,

v.

BRISTOL-MYERS SQUIBB and PFIZER, INC.             DEMAND FOR JURY TRIAL
           DEFENDANTS.

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff, Maurice Jackson, by and through the undersigned counsel, upon information and belief, at all times hereinafter mentioned, alleges as follows:

### JURISDICTION AND VENUE

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy as to the Plaintiff exceeds $75,000.00, exclusive of interest and costs, and because there is complete diversity of citizenship between the Plaintiff and the Defendants.

2. Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the claim occurred in this District.

3. This Court has personal jurisdiction over the Defendants because they actively sell, market and promote their pharmaceutical product, Eliquis (apixaban), to physicians and consumers in this state on a regular and consistent basis.

### NATURE OF THE CASE

4. This action is brought on behalf of MAURICE JACKSON ("Plaintiff"). Plaintiff was prescribed Eliquis, also known as apixaban, due to a risk of blood clots and risk of stroke.

1

5. Defendants, BRISTOL-MYERS SQUIBB and PFIZER, INC., (hereinafter collectively referred to as "Defendants") designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed Eliquis, as well as dealt with governmental regulatory bodies.

6. In written information about the safety and risks of Eliquis, Defendants negligently and fraudulently represented to the medical and healthcare community, including Plaintiff's prescribing doctor, the Food and Drug Administration (hereinafter referred to as the "FDA"), to Plaintiff and the public in general, that Eliquis had been tested and was found to be safe and effective for its indicated uses.

7. Defendants concealed their knowledge of Eliquis' defects, from Plaintiff, the FDA, the public in general and the medical community, including Plaintiff's prescribing doctor.

8. These representations were made by Defendants with the intent of defrauding and deceiving Plaintiff, the public in general, and the medical and healthcare community including Plaintiff's prescribing doctor, and were made with the intent of inducing the public in general, and the medical community in particular, to recommend, dispense and purchase Eliquis, all of which evinced a callous, reckless, willful, depraved indifference to health, safety and welfare of the Plaintiff herein.

9. As a result of the foregoing acts and omissions, the Plaintiff was caused to suffer serious and dangerous side effects including bleeding, physical pain and mental anguish, including diminished enjoyment of life.

**PARTY PLAINTIFF**

10. Upon information and belief, Plaintiff ingested Eliquis from upon direction of his physician for the treatment of blood clots and stroke prevention due to atrial fibrillation.

11. As a direct and proximate result of the use of Defendants' Eliquis, Plaintiff experienced internal bleeding, as well as severe pain and suffering.

12. Plaintiff currently resides in Louisiana. At the time of ingestion and injury, he resided in Sabine Parish, Louisiana.

13. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and incurred damages, including medical expenses, physical pain and mental anguish, diminished enjoyment of life, and loss of earnings, among other damages.

**PARTY DEFENDANTS**

14. Upon information and belief, Defendant Bristol-Myers Squibb Company ("BMS") is organized under the laws of Delaware, with a principal place of business at 345 Park Ave., N.Y., N.Y. Pursuant to Federal Rule of Civil Procedure 4(e)(1) and 4(h)(1)(A), Bristol-Myers Squibb Company may be served in accordance with La. R.S. § 13:3204 at The Corporation Trust Company, Corporation Trust Center 1209 Orange St. Wilmington, DE. Defendant BMS is the holder of the approved New Drug Application ("NDA") for Eliquis as well as the supplemental NDA.

15. As part of its business, BMS was and is involved in the research, development, sales, and marketing of pharmaceutical products including Eliquis.

16. At all relevant times, Defendant BMS was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Eliquis for use as an oral anticoagulant.

17. Defendant PFIZER, INC. ("Pfizer") is, and at all relevant times was, a corporation organized under the laws of the State of Delaware with its principal place of business at 235 E. 42d St., N.Y., N.Y. Pfizer is registered to do business in Louisiana and may be served

through its registered agent: CT Corporation System, 3867 Plaza Tower Drive, Baton Rouge, LA 70816.

18. Defendant Pfizer was and is in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Eliquis for use as an oral anticoagulant.

19. In 2007, defendants entered into a worldwide collaboration to "commercialize" apixaban (Eliquis), which they have promoted as combining BMS's "long-standing strengths in cardiovascular drug development and commercialization" with Pfizer's "global scale and expertise in this field."

## FACTUAL BACKGROUND

20. At all relevant times, Defendants were in the business of and did design, research, manufacture, test, advertise, promote, market, sell and distribute Eliquis as an oral anticoagulant, also known as a Factor Xa inhibitor.

21. Defendants received FDA approval to market Eliquis in 2012 (NDA 202155).

22. Among the uses for which it obtained permission to market Eliquis was in the treatment of atrial fibrillation.

23. Approval of Eliquis was based in large part on clinical trials known as ARISTOTLE.

24. The ARISTOTLE study was conducted under the supervision and control of defendants, in various countries, including China.

25. Defendants, as means of cutting costs, chose incompetent and untrustworthy agents in China to conduct the ARISTOTLE study.

26. Defendants' agents committed fraud in their conduct of the ARISTOTLE study,

4

by concealing side effects which occurred in test users of Eliquis; a death which went unreported (whereas one purpose of the study was to study the rate of death in Eliquis users compared to others in Coumadin); loss of subjects to follow up; major dispensing errors including indicating that certain subjects were getting Eliquis when they were not; poor overall quality control; and changing and falsifying records, including records disappearing just before the FDA made a site visit, reportedly on the order of an employee of BMS.

27. At a Feb. 9, 2012, meeting between the FDA and BMS-Pfizer executives, the FDA is reported to have characterized the conduct of defendants as showing a pattern of inadequate supervision.

28. Defendants market Eliquis as a new oral anticoagulant treatment alternative to warfarin (Coumadin), a long-established safe treatment for preventing stroke and systemic embolism. Defendants emphasize the supposed benefits of treatment with Eliquis over warfarin, in that Eliquis does not require periodic monitoring with blood tests and did not limit a patient's diet, and that a set dose fits all patients.

29. When the application by defendants to the FDA was pending, in 2012, Dr. Thomas Marcinak, a physician in the FDA who reviewed the data submitted by defendants in order to obtain approval to market Eliquis, objected to missing data from the ARISTOTLE study and recommended that the labeling which defendants were going to use with the drug should discuss the quality control problems in ARISTOTLE, the Chinese study.

30. Instead of admitting the major errors and frauds involved in the ARISTOTLE study, defendants misleadingly stated publically that they were submitting "additional data" to the FDA, and to this date have never publically acknowledged the missing and incorrect data submitted to the FDA, which would be of concern to prescribing physicians and the public.

31. After employees of defendants wrote and submitted an article based on the ARISTOTLE study for the New England Journal of Medicine, the article was reportedly attacked for its accuracy and omissions by the former editor-in-chief of that journal, Arnold Relman, M.D., including the failure to show that Eliquis was any more efficacious than low-cost warfarin.

32. Critically, there is no antidote to Eliquis, unlike warfarin. Therefore, in the event of hemorrhagic complications, there is no available or validated reversal agent or antidote, as there is for Coumadin.

33. The U.S. label approved when the drug was first marketed in the U.S. and at the time Plaintiff was using it did not contain an adequate warning regarding the lack of antidote, and the significance of that problem for patients who began to bleed.

34. After the drug was approved by the FDA, Defendants engaged in an aggressive marketing campaign for Eliquis, including extensive marketing directly to the public, via TV and print. The chief promotional aspect of the sales pitch was that, unlike with Coumadin, the blood levels of the patient did not need to be monitored.

35. In the course of these direct-to-consumer advertisements, Defendants overstated the efficacy of Eliquis with respect to preventing stroke and systemic embolism, failed to adequately disclose to patients that there is no drug, agent, or means to reverse the anticoagulation effects of Eliquis, and that such irreversibility would have life-threatening and fatal consequences.

36. Prior to Plaintiff's use of Eliquis, Plaintiff became aware of the promotional materials described herein.

37. Prior to Plaintiff's use of Eliquis, Plaintiff's prescribing physician received

promotional materials and information from sales representatives of Defendants that Eliquis was just as effective as warfarin in reducing strokes in patients with non-valvular atrial fibrillation, and was more convenient, without also adequately informing prescribing physicians that there was no reversal agent that could stop or control bleeding in patients taking Eliquis.

38. At all times relevant hereto, Defendants also failed adequately to warn emergency room doctors, surgeons, and other critical care medical professionals that unlike generally-known measures taken to treat and stabilize bleeding in users of warfarin, there is no effective agent to reverse the anticoagulation effects of Eliquis, and therefore no effective means to treat and stabilize patients who experience uncontrolled bleeding while taking Eliquis.

39. Before and after marketing Eliquis, defendants became aware of many reports of serious hemorrhaging in users of its drugs, both as reported to the FDA and to it directly. Yet defendants have never disclosed to the medical profession or patients what the incidence of such adverse reactions are.

40. Despite the clear signal generated by the side effect data, Defendants failed to either alert the public and the scientific community, or perform further investigation into the safety of Eliquis.

41. Defendants' product labeling and prescribing information for Eliquis:

    (a)    failed to investigate, research, study and define, fully and adequately, the safety profile of Eliquis;

    (b)    failed to provide adequate warnings about the true safety risks associated with the use of Eliquis;

    (c)    failed to provide adequate warning regarding the pharmacokinetic and pharmacodynamic variability of Eliquis and its effects on the degree of anticoagulation in a patient;

(d) failed to provide adequate warning that it is difficult or impossible to assess the degree and extent of anticoagulation in patients taking Eliquis;

(e) failed to disclose in the "Warnings" Section that there is no drug, agent or means to reverse the anticoagulation effects of Eliquis;

(f) failed to advise prescribing physicians, such as the Plaintiff's physician, to instruct patients that there was no agent to reverse the anticoagulant effects of Eliquis;

(g) failed to provide adequate instructions on how to intervene and stabilize a patient who suffers a bleed while taking Eliquis;

(h) failed to provide adequate warnings and information related to the increased risks of bleeding events associated with aging patient populations of Eliquis users;

(i) failed to provide adequate warnings regarding the increased risk of gastrointestinal bleeds in those taking Eliquis, especially, in those patients with a prior history of gastrointestinal issues and upset;

(j) failed to provide adequate warnings regarding the increased risk of suffering a bleeding event, requiring blood transfusions in those taking Eliquis;

(k) failed to provide adequate warnings regarding the need to assess renal functioning prior to starting a patient on Eliquis and to continue testing and monitoring of renal functioning periodically while the patient is on Eliquis;

(l) failed to provide adequate warnings regarding the need to assess hepatic functioning prior to starting a patient on Eliquis and to continue testing and monitoring of hepatic functioning periodically while the patient is on Eliquis;

(m) failed to include a "BOXED WARNING" about serious bleeding events associated with Eliquis;

(n) failed to include a "BOLDED WARNING" about serious bleeding events associated with Eliquis; and

8

 (o) in their "Medication Guide" intended for distribution to patients to whom Eliquis has been prescribed, Defendants failed to disclose to patients that there is no drug, agent or means to reverse the anticoagulation effects of Eliquis and that if serious bleeding occurs, such irreversibility could have permanently disabling, life- threatening or fatal consequences.

 (p) Failed to warn of the severity and duration of such adverse effects, as the warning given did not accurately reflect they symptoms or severity of side effects;

 (q) Failed to warn regarding the need for more comprehensive, more regular medical monitoring to ensure early discovery of potentially serious side effects;

 (r) Failed to instruct how to adjust the dosage to the particular patient and instead stated misleadingly and inaccurately that one dosage fit all patients.

42. As a result of Defendants' aggressive marketing efforts, it had sales of $774 million in 2014, of which $281 million was just for the fourth quarter alone. Eliquis has been referred to by the defendants as a blockbuster drug. In support of its aggressive marketing, defendants jointly paid more than $8 Million to doctors in 2013, according to ProPublica/NY Times.

43. Despite life-threatening bleeding findings in a clinical trial and other clinical evidence, Defendants failed to adequately conduct complete and proper testing of Eliquis prior to filing their New Drug Application for Eliquis.

44. From the date Defendants received FDA approval to market Eliquis, Defendants made, distributed, marketed, and sold Eliquis without adequate warning to Plaintiff's prescribing physicians or Plaintiff that Eliquis was associated with and could cause life- threatening bleeding, presented a risk of life-threatening bleeding in patients who used it, and that Defendants had not adequately conducted complete and proper testing and studies of Eliquis

with regard to severe side effects, specifically life-threatening bleeding.

45. Upon information and belief, Defendants concealed and failed to completely disclose its knowledge that Eliquis was associated with or could cause life-threatening bleeding as well as its knowledge that they had failed to fully test or study said risk.

46. Defendants ignored the association between the use of Eliquis and the risk of developing life-threatening bleeding.

47. Defendants' failure to disclose information that they possessed regarding the failure to adequately test and study Eliquis for life-threatening bleeding risk further rendered warnings for this medication inadequate.

48. By reason of the foregoing acts and omissions, Plaintiff has endured and continues to suffer including medical expenses, physical pain and mental anguish, diminished enjoyment of life, and loss of earnings, among other damages.

## FIRST CAUSE OF ACTION AS AGAINST THE DEFENDANTS
## DESIGN DEFECT UNDER LA. R.S. 9:2800.56
## (PRODUCTS LIABILITY)

49. Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

50. Eliquis is defective in its design or formulation in that it is not reasonably fit, suitable, or safe for its intended purpose and/or its foreseeable risks exceed the benefits associated with its design and formulation. The subject product was unreasonably dangerous in design as provided by La.R.S. 9:2800.56.

51. At all times material to this action, Eliquis was expected to reach, and did reach, consumers in the State of Louisiana and throughout the United States, including Plaintiff herein,

without substantial change in the condition in which it was sold.

52. At all times material to this action, Eliquis was designed, developed, manufactured, tested, packaged, promoted, marketed, distributed, labeled, and/or sold by Defendants in a defective and unreasonably dangerous condition at the time it was placed in the stream of commerce in ways which include, but are not limited to, one or more of the following particulars:

   a. When placed in the stream of commerce, Eliquis contained unreasonably dangerous design defects and was not reasonably safe as intended to be used, subjecting Plaintiff to risks that exceeded the benefits of the subject product, including but not limited to permanent, personal, life-threatening injuries;

   b. When placed in the stream of commerce, Eliquis was defective in design and formulation, making the use of Eliquis more dangerous than an ordinary consumer would expect, and more dangerous than other risks associated with the other medications and similar drugs on the market;

   c. Eliquis's design defects existed before it left the control of the Defendants;

   d. Eliquis was insufficiently tested;

   e. Eliquis caused harmful side effects that outweighed any potential utility; and

   f. Eliquis was not accompanied by adequate instructions and/or warnings to fully apprise consumers, including Plaintiff herein, of the full nature and extent of the risks and side effects associated with its use, thereby rendering Defendants liable to Plaintiff.

53. The Eliquis designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective in design and formulation, in that, when it left the hands of the Defendants, manufacturers, and suppliers, it was unreasonably dangerous, and it was more dangerous than an ordinary consumer would expect.

54. At all times herein mentioned, Eliquis was in a defective condition and unsafe,

11

and Defendants knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendants.

55. Eliquis as designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective due to inadequate post-marketing surveillance and warnings because, after Defendants knew or should have known of the risks of serious side effects including, life-threatening bleeding, as well as other severe and permanent health consequences from Eliquis, they failed to provide adequate warnings to users or consumers of the product, and continued to improperly advertise, market and promote their product, Eliquis.

56. Defendants knew, or should have known that at all times herein mentioned, that Eliquis was in a defective condition, and was and is inherently dangerous and unsafe.

57. At the time of the Plaintiff's use of Eliquis, Eliquis was being used for the purposes and in a manner normally intended, namely to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

58. Defendants with this knowledge voluntarily designed its Eliquis in a dangerous condition for use by the public, and in particular the Plaintiff.

59. Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

60. Defendants created a product unreasonably dangerous for its normal, intended use.

61. The Eliquis designed, researched, manufactured, tested, advertised, promoted,

marketed, sold and distributed by Defendants was manufactured defectively in that Eliquis left the hands of Defendants in a defective condition and was unreasonably dangerous to its intended users.

62. The Eliquis as designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants reached their intended users in the same defective and unreasonably dangerous condition in which the Defendants' Eliquis was manufactured.

63. In addition, at the time the subject product left the control of the Defendants, there were practical and feasible alternative designs that would have prevented and/or significantly reduced the risk of Plaintiff's injuries without impairing the reasonably anticipated or intended function of the product. These safer alternative designs were economically and technologically feasible, and would have prevented or significantly reduced the risk of Plaintiff's injuries without substantially impairing the product's utility.

64. The Plaintiff could not, by the exercise of reasonable care, have discovered Eliquis' defects herein mentioned and perceived its danger.

65. Said defects in Defendants' drug Eliquis were a substantial factor in causing Plaintiff's injuries.

66. As a result of the foregoing acts and omissions, Plaintiff suffered serious and dangerous side effects including but not limited to, life-threatening, cerebral hemorrhaging, as well as other severe and personal injuries, physical pain and mental anguish, and financial expenses for hospitalization and medical care, and other economic and non-economic damages.

**SECOND CAUSE OF ACTION**
**INADEQUATE WARNING UNDER LA.R.S. 9:2800.57**
**(PRODUCTS LIABILITY)**

67. Plaintiff repeats, reiterates and re-alleges each and every allegation of this

Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

68. Eliquis was defective and unreasonably dangerous when it left the possession of the Defendants in that it contained warnings insufficient to alert consumers, including Plaintiff herein, and her health care providers, of the dangerous risks and reactions associated with the subject product, including but not limited to its propensity to cause permanent physical injuries and side effects, notwithstanding the Defendants' knowledge of an increased risk of these injuries and side effects.  Thus, the subject product was unreasonably dangerous because an adequate warning was not provided as provided pursuant to La.R.S. 9:2800.57.

69. The subject product manufactured and supplied by Defendants was defective due to inadequate post-marketing warning or instruction because, after Defendants knew or should have known of the risk of serious bodily harm from the use of the subject product, Defendants failed to provide an adequate warning to consumers and/or their health care providers of the defects of the product, and/or alternatively failed to conform to federal and/or state requirements for labeling, warnings and instructions, or recall, while knowing that the product could cause serious injury.

70. Plaintiff was prescribed and used the subject product for its intended purpose.

71. Plaintiff could not have discovered any defect in the subject product through the exercise of reasonable care.

72. The Defendants, as manufacturers and/or distributors of the subject prescription product, are held to the level of knowledge of an expert in the field.

73. The warnings that were given by the Defendants were not accurate, clear and/or were ambiguous.

74. The warnings that were given by the Defendants failed to properly warn physicians of the increased risks of permanent physical injuries and side effects.

75. Plaintiff, individually and through her prescribing physician(s), reasonably relied upon the skill, superior knowledge and judgment of the Defendants.

76. The Defendants had a continuing duty to warn Plaintiff of the dangers associated with the subject product.

77. Had Plaintiff received adequate warnings regarding the risks of the subject product, he would not have used it.

78. As a result of the foregoing acts and omissions, Plaintiff suffered serious and dangerous side effects including but not limited to, life-threatening, cerebral hemorrhaging, gastrointestinal bleeding as well as other severe and personal injuries, physical pain and mental anguish, and medical expenses.

### THIRD CAUSE OF ACTION
### BREACH OF EXPRESS WARRANTY UNDER LA. R.S. 9:2800.58
### (PRODUCTS LIABILITY)

79. Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

80. At all times herein mentioned, the Defendants manufactured, compounded, portrayed, distributed, recommended, merchandized, advertised, promoted and sold Eliquis and/or have recently acquired the Defendants who have manufactured, compounded, portrayed, distributed, recommended, merchandized, advertised, promoted and sold Eliquis, to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT

for patients undergoing hip and knee replacement surgery.

81. Defendants expressly represented to Plaintiff, other consumers, and the medical community that Eliquis was safe and fit for its intended purposes, was of merchantable quality, did not produce any dangerous side effects, and had been adequately tested.

82. Eliquis does not conform to Defendants' express representations because it is not safe, has numerous and serious side effects and causes severe and permanent injuries.

83. At the time of the making of the express warranties, Defendants knew or should have known of the purpose for which the subject product was to be used and warranted the same to be, in all respects, fit, safe, and effective and proper for such purpose. The subject product was unreasonably dangerous because it failed to conform to an express warranty of the defendants as provided by La.R.S. 9:2800.58.

84. At the time of the making of the express warranties, Defendants knew or should have known that, in fact, said representations and warranties were false, misleading, and untrue in that the subject product was not safe and fit for its intended use and, in fact, produces serious injuries to the user.

85. At all relevant times Eliquis did not perform as safely as an ordinary consumer and the medical community would expect, when used as intended or in a reasonably foreseeable manner.

86. Plaintiff, other consumers, and the medical community relied upon Defendants' express warranties.

87. Members of the medical community, including physicians and other healthcare professionals, relied upon the representations and warranties of the Defendants for use of Eliquis in recommending, prescribing, and/or dispensing Eliquis.

88. The Defendants herein breached the aforesaid express warranties, as their drug Eliquis was defective.

89. Defendants expressly represented to Plaintiff, Plaintiff's physicians, healthcare providers, and/or the FDA that Eliquis was safe and fit for use for the purposes intended, that it was of merchantable quality, that it did not produce any dangerous side effects in excess of those risks associated with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, that the side effects it did produce were accurately reflected in the warnings and that it was adequately tested and fit for its intended use.

90. Defendants knew or should have known that, in fact, said representations and warranties were false, misleading and untrue in that Eliquis was not safe and fit for the use intended, and, in fact, produced serious injuries to the users that were not accurately identified and represented by Defendants.

91. As a result of the foregoing breaches, Plaintiff suffered serious and dangerous side effects including but not limited to, life-threatening, cerebral hemorrhaging, gastrointestinal bleeding, as well as other severe and personal injuries, physical pain and mental anguish, and economic and non-economic losses.

**EQUITABLE TOLLING OF APPLICABLE STATUTES OF LIMITATIONS**

92. Defendants failed to disclose a known defect and affirmatively misrepresented that Eliquis was safe for its intended use. Further, Defendants actively concealed the true risks associated with the use of Eliquis. Neither Plaintiff nor Plaintiff's prescribing physicians had knowledge that Defendants were engaged in the wrongdoing alleged herein. Because of

Defendants' concealment of and misrepresentations regarding the true risks associated with Eliquis, Plaintiff could not have reasonably discovered Defendants' wrongdoing at any time prior to the commencement of this action.

93. Thus, because Defendants fraudulently concealed the defective nature of Eliquis and the risks associated with its use, the running of any statute of limitations has been tolled. Likewise, Defendants are estopped from relying on any statute of limitations.

94. Additionally, and alternatively, Plaintiff files this lawsuit within the applicable limitations period of first suspecting that Eliquis caused the appreciable harm sustained by Plaintiff. Plaintiff did not have actual or constructive knowledge of facts indicating to a reasonable person that Plaintiff was the victim of a tort. Plaintiff was unaware of the facts upon which a cause of action rests until less than the applicable limitations period prior to the filing of this action. Plaintiff's lack of knowledge was not willful, negligent, or unreasonable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against the Defendants on each of the above- referenced claims and Causes of Action and as follows:

1. Awarding compensatory damages jointly and / or severally against Defendants in excess of $75,000, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

2. Awarding economic damages in the form of past and future medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determined at trial of this action;

3. Pre-judgment interest;

4. Post-judgment interest;

5. Awarding Plaintiff reasonable attorneys' fees;

6. Awarding Plaintiff the costs of these proceedings; and

7. Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all issues.

Dated: April XX, 2016

                                            RESPECTFULLY SUBMITTED,

                                            By:/s/ Lisa Causey-Streete
                                            Lisa Causey-Streete
                                            Attorney Identification No.: 33767
                                            Robert L. Salim
                                            Attorney Identification No.: 11663
                                            SALIM-BEASLEY, LLC
                                            1901 Texas Street
                                            Natchitoches, LA 71457
                                            Office: 318-354-1818
                                            Fax: 318-354-1227
                                            Email: lcausey@salim-beasley.com
                                            Email: robertsalim@cp-tel.net

                                            *ATTORNEYS FOR PLAINTIFF*